UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FERGUSON, BRASWELL<br>& FRASER, P.C., | § § § | |
| Plaintiff, | § § | |
| Vs. | § § | CIVIL ACTION NO. 3:15-CV-4019 |
| TRAVELERS CASUALTY INSURANCE<br>COMPANY OF AMERICA, | § § § § | |
| Defendant, | § § | |
| Vs. | § § | |
| IBERIA BANK, | § § | |
| Defendant. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff FERGUSON, BRASWELL & FRASER, P.C. (the "Firm") files this First Amended Complaint against Defendants TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA ("Travelers") and IBERIA BANK ("Iberia"), and states the following:

**I.
SUMMARY**

1.      This case involves a fraud perpetrated upon the Firm – a law firm located in the Dallas/Fort Worth area – by a would-be client. The would-be client forwarded to the Firm a cashier's check, which the Firm promptly and properly deposited in its trust account. The would-be client instructed the Firm to release a portion of the trust funds. After receiving confirmation from Iberia that the cashier's check had cleared, the Firm instructed Iberia to transfer the trust funds to an account designated by the would-be client. However, (a) the cashier's check in fact

was a forgery and (b) the cashier's check in fact had not cleared as stated by Iberia. As a result of the would-be client's fraud, and Iberia's negligence, the Firm lost $200,000.

2. The Firm brings this action against Defendants to recover the $200,000 and other damages in which the Firm is owed by law and in equity. The Firm seeks this amount from Travelers based on an insurance policy issued prior to fraudulent transaction, which covered this type of fraudulent transaction. Alternatively, the Firm seeks recovery from Iberia, whose negligent misrepresentation (*i.e.* that the cashier's check had cleared) was a proximate cause of the Firm's loss.

## II.
## PARTIES

3. FERGUSON, BRASWELL & FRASER, P.C. is a law firm licensed to practice law in the State of Texas.

4. TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA is a foreign insurance company licensed to do business in the state of Texas, with its principal place of business in Connecticut. Service may be had on Travelers by serving its registered agent for service of process, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

5. IBERIA BANK is a foreign financial institution licensed to do business in the State of Texas, with its principal place of business in the State of Louisiana. Service may be had on Iberia by serving its Texas registered agent, at C T Corporation System, 1999 Bryan St, Ste. 9000, Dallas, Texas 75201-3136.

## III.

# JURISDICTION

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because this is a civil action with diversity of citizenship between the Firm, Travelers, and Iberia, in which the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. This Court has *in personum* jurisdiction over Iberia because Iberia engages in systematic and continuous activities within the forum state and defendants enjoy the benefits and protections afforded by the state of Texas. Moreover, Iberia's contacts with the state give rise to the harm suffered by Plaintiff and exercising its authority to hear this case would be consistent with traditional notions of fair play and substantial justice.

## IV.
## VENUE

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.

9. Venue also is proper in this Court pursuant to 28 U.S.C. §1391(d) because Iberia operates a branch office in Dallas County, Texas. *See Third Nat. Bank v. Impac, Ltd.*, 432 U.S. 312, 316-318, 97 S.Ct. 2307, 2310-11, 53 L.Ed. 2d 368 (1977).

## V.
## FACTS

**A.     THE SCAM.**

10.     This lawsuit relates to a fraud recently committed upon the Firm.

11.     On or about February 19, 2015, John Fraser (of the Firm) was contacted by a man claiming to Bill Sherman.  Mr. Sherman claimed to be involved in oil exploration in Texas.  Mr. Sherman asked Mr. Fraser whether he or one of his partners could assist with the documentation of a purchase and sale transaction in Texas.  Mr. Fraser informed Mr. Sherman that although he did not perform this type of legal work, he would see if another member of the Firm could assist him.

12.     Mr. Fraser put Mr. Sherman in contact with Dustin Sparks, a transactional attorney with the Firm.  During this conversation, Mr. Sherman stated he was interested in selling a drilling rig (the "Transaction") for approximately $11,000,000 to a company called ING Oil Inc. ("ING"), which allegedly was represented by TNTH Global Investment ("TNTH").  In order to preserve its rights during a pre-contract inspection (which was to be arranged by Mr. Sherman), ING agreed to pay $450,000 into escrow, $250,000 which would be held in escrow until purchase of the drilling rig and $200,000 of which would be released to a third party inspection company to cover inspection costs for the inspection of the drilling rig.  Based on Mr. Sherman's description of the transaction and his agreement to pay the Firm's fees and retainer, Mr. Sparks agreed to represent him.

13.     When Mr. Sherman first spoke with Mr. Sparks, the terms of the Transaction had not been finalized.  Mr. Sherman stated that once he completed negotiations, he would have TNTH prepare a Letter of Intent (the "LOI") outlining the business term of the transactions based on the

foregoing. At that time, Mr. Sherman would require TNTH to deliver the $450,000 earnest money payment.

14. On March 9, 2015, Mr. Sherman sent an e-mail (from billsherman@edfenergydrilling.com) to Mr. Sparks regarding the Transaction. Mr. Sherman stated TNTH had signed the LOI, and would deliver the earnest money to Mr. Sparks that day. The LOI states the following regarding the earnest money and inspection costs:

> EARNEST MONEY: Deposit in the amount of 450,000.00 has been attached to our LOI which covers the cost of inspection; all earnest money shall be applied to the Purchase Price at closing.
>
> EXPENDITURE: Attorney has been AUTHORIZED to release 200,000 to seller for inspection cost and insurance coverage to commence Inspection which we have both agreed is non-refundable. Balance funds should be held in trust until final closing.
>
> PAYMENT: $450,000 has been issued by Cashier's check from the buyer which is guaranteed funds, balance $10,550,000 will be issued by wire transfer to seller upon completion of Inspection and signing of Purchase contract.

15. In conjunction with the signed LOI, TNTH delivered a cashier's check (the "Cashier's Check") to the Firm in the amount of $450,000. The Cashier's Check was made payable to the Firm and from Citibank, N.A.

16. On March 10, 2015, Mr. Sparks once again spoke with Mr. Sherman. Mr. Sparks notified Mr. Sherman that he had received the LOI (signed by ING) and the Cashier's Check. Mr. Sparks requested a copy of the LOI signed by Mr. Sherman before he proceeded to deposit the Cashier's Check and move forward with the Transaction. Mr. Sparks stated that when and if the Cashier's Check cleared, he would release the $200,000 (the inspection/insurance costs) to the account designated in the LOI for inspection of the drilling rig as required in the LOI.

17. On March 12, 2015, Mr. Sherman sent an e-mail to Mr. Sparks, attaching a copy of the fully-signed LOI and wiring the instructions for the drilling rig inspection company. At that time, Mr. Sparks instructed Ashlee Rouse, the Firm's CFO, to contact Iberia Bank (the Firm's bank) to inquire whether the Cashier's Check had cleared and the funds were available for delivery to the inspection company. Iberia Bank's online records indicated that the funds represented by the Cashier's Check in fact were in the Firm's trust account and available. Therefore, after confirmation from the Firm's bank that the Cashier's Check had cleared and funds were available, Mrs. Rouse authorized Iberia Bank to wire transfer $200,000 to the inspection company for the inspection of the drilling rig. Mr. Sherman contacted Mr. Sparks on March 12, 2015 to insure the funds had been wired to the inspection company, which was confirmed by Mrs. Rouse.

18. During the week of March 16, 2015, a representative of Iberia Bank contacted Mrs. Rouse and notified her that the Cashier's Check had been rejected by Citibank, the bank that purportedly issued the Cashier's Check, and Mrs. Rouse contacted Mr. Sparks to notify him of the fraud. Without notice to the Firm and against the Firm's knowledge, according to Citibank, the Cashier's Check was a counterfeit. Rather than call Citibank to confirm the Cashier's Check's authenticity, Iberia Bank simply credited the Firm's trust account as a "courtesy". Iberia Bank did not notify Mrs. Rouse of this "courtesy" when she inquired about the funds, but instead stated that the funds were in the Firm's trust account – indicating that the Cashier's Check had cleared and the funds were available.

19. Upon learning that the Cashier's Check was likely a counterfeit, Mr. Sparks contacted Mr. Sherman to notify him the cashier's check received by the Firm was potentially a counterfeit and to arrange for payment by Mr. Sherman. Mr. Sherman seemed very surprised and agitated by the failure to deliver good funds, assured Mr. Sparks he would call the broker

immediately, and assured Mr. Sparks that he would contact his bank and have the $200,000 wired to the Firm's account immediately (and requested the Firm's wiring instructions) and would handle this purchaser immediately. In fact, according to the U.S. Secret Service, the FBI, and the Plano, Texas Police Department (all of which have spoken with Mr. Sparks and other employees of the Firm), Mr. Sherman's name actually is Muhammad Naji. Mr. Naji has performed similar scams on other law firms, in which he and his partners in crime pretends to be both the buyer and seller of real property. Mr. Naji was convicted by the United States Middle District of Florida for fraud and money laundering.

**B.     THE POLICY.**

20.     Prior to the Transaction, the Firm obtained Office Pac insurance policy number 680-7E593217-14-42 (the "Policy") from Travelers for the period from June 1, 2014 to June 1, 2015. The Policy was in full force and effect at the time of the Transaction.

21.     The Policy contains a standard "Business Property Coverage" form. This form generally affords coverage for "directly physical loss of or damage to Covered Property," which is defined to include "money" and "securities." These coverages are subject to a series of exclusions, including the following:

> Voluntary parting with any property by [the Firm] or anyone else to whom [the Firm has] entrusted the property.

This exclusion is referred to herein as the "Voluntary Parting Exclusion."

22.     The Policy, however, is not limited to the basic coverage in the Business Property Coverage form. The Policy indicates it is a "Custom Insurance Policy Prepared for [the Firm]." One of the custom coverages afforded by the Policy – *for which the Firm paid an additional premium* – relates specifically to scams such as the Transaction:

      **k.    Money Orders and Counterfeit Paper Currency**

When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss due to the food faith acceptance of:

1. Any U.S. or Canadian post office or express money order, issued or purporting to have been issued by any post office or express company, if the money order is not paid upon presentation; or

2. Counterfeit United States or Canadian paper currency;

in exchange for merchandise, "money" or services or as part of a normal business transaction.

This provision is referred to herein as the "Money Order Provision." The Policy does not define the terms "express money order" or "express company."

**C.    THE CLAIM.**

23.    On July 10, 2015 (within the period required by the Policy for written notice), the Firm wrote to Travelers regarding the Transaction, requesting Travelers to compensate the Firm for its loss. This claim was assigned Claim No. E1S4054 (the "Claim").

24.    On or about July 29, 2015, Travelers sent a letter (the "Denial Letter") to the Firm, denying the Claim. Travelers contends when the Firm wired funds from its escrow account – as it was fraudulently instructed to do by its "client" – the Firm "voluntarily parted" with the funds ($200,000) that are the subject of the Claim. Travelers contends this "voluntary parting" triggered the Voluntary Parting Exclusion.

25.    In a subsequent telephone conversation with the Firm's coverage attorney, Travelers' adjuster directed him to several decisions that Travelers relied upon in "support" of its position. These decisions are not on point. For example, in *Schweet Linde & Coulson, P.L.L.C. v. Travelers Casualty Insurance Company of America*, 2015 WL 3447242 (W.D. Wash., 2015),

the insured distributed trust funds based on its receipt of a bogus cashier's check, and a fraudulent instruction from the insured's "client." The court found the policy's coverage for "theft" was not inconsistent with the "voluntary parting" exclusion. "While [the insured] may have been unaware of the donut hole in its coverage, it has not identified an ambiguity or offered a reasonable interpretation of the policy that could justify a finding of coverage. Thus, a loss by theft is not covered if [the insured] voluntarily parted with the property." *Id.* at *3.

26. As the Firm's coverage attorney explained, the Claim is not based on the Policy's theft coverage. The Policy contains a coverage *extension* that is not discussed in the *Schweet* decision. In the Denial Letter, Travelers does not dispute that a cashier's check is the equivalent of an "express money order," or that the Firm received the cashier's check (the subject of the Claim) as part of a normal business transaction. As such, the *Schweet* decision is inapplicable.

27. The Firm's coverage attorney further explained that, unlike the theft claim in *Schweet,* the Money Order Provision is inherently inconsistent with the Voluntary Parting Exclusion (if interpreted to include payments induced by fraud). The *Schweet* court noted that a theft claim could exist where an insured is not defrauded; *i.e.* the theft coverage was *broader* than the exclusion. However, a claim under the Money Order Provision is specifically limited to situations where the insured is defrauded ("loss due to the *good faith acceptance* of . . . an express money order"). If the Voluntary Parting Exclusion were interpreted to apply to situations where the insured is defrauded, there *never* would be coverage under the Money Order Provision.

28. Finally, the Firm's coverage attorney explained the Money Order Provision's coverage is distinguishable from theft coverage based on nature of the loss, and when it occurs. Theft, by its nature, occurs when property leaves a person's possession. The Money Order Provision claim, on the other hand, is ripe when "the money order is not paid upon presentation."

An insured is not required to "part" with anything in order to trigger coverage under the Money Order Provision. Under our facts, the Firm did not "part" with the bogus cashier's check, but instead simply paid money based on its good faith reliance on the cashier's check validity. As such, the Voluntary Parting Exclusion is not applicable.

29. As explained above, the Firm went to great lengths to provide the facts of the Claim, and to explain why the Claim was covered. The Firm even explained to Travelers' adjuster why the decision upon which Travelers relied in the Denial Letter was not applicable to the Claim. The Firm's efforts were in vain. Although Travelers' adjuster could not offer a single example of when a law firm *ever* would have a covered claim under the Money Order Provision, he refused to reconsider Travelers' denial. Instead, he advised the Firm's coverage attorney he would have to file suit.

## VI.
## CAUSES OF ACTION

**A. BREACH OF CONTRACT BY TRAVELERS.**

30. Paragraphs 10 through 29 are incorporated by reference.

31. The conduct of Travelers, as described above, constitutes a breach of the insurance contract made between Travelers and the Firm.

32. Travelers' failure and refusal, as described above, to pay the Claim as it is obligated to do under the terms of the Policy and under the laws of the State of Texas, constitutes a material breach of the insurance contract with the Firm. Travelers' breach of the contract proximately caused the Firm to suffer damages in the form of actual damages and consequential damages, along with reasonable and necessary attorney's fees. The Firm has complied with all obligations and conditions required of it under the Policy.

B. **VIOLATIONS OF THE TEXAS INSURANCE CODE BY TRAVELERS.**

33. Paragraphs 10 through 29 are incorporated by reference.

34. The conduct of Travelers, as described herein, constitutes multiple violations of the Texas Unfair Compensation and Unfair Practices Act., TEX. INS. CODE Chapter 541. All violations under this article are made actionable by TEX. INS. CODE Section 541.151.

35. Travelers' unfair practice, described above, of misrepresenting to the Firm material facts relating to the coverage at issue, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE Sections 541.051, 541.060 and 541.061.

36. Travelers' unfair settlement practice, as described above, of failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the claims even though its liability under the Policy was reasonably clear, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE Sections 541.051, 541.060 and 541.061.

37. Travelers' unfair settlement practice, as described above, of failing to promptly provide the Firm with a reasonable explanation of the basis in the Policy, in relation to the facts or applicable law, constitutes an unfair method of competition and an unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE Sections 541.051, 541.060 and 541.061.

38. Finally, Travelers' unfair settlement practice, described above, of refusing to pay the Firm's Claim while failing to conduct a reasonable investigation, constitutes an unfair method of competition, and unfair and deceptive act or practice in the business of insurance. TEX. INS. CODE Sections 541.001, et seq., including, without limitation, 541.051, 541.060 and 541.061.

C. **BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING BY TRAVELERS.**

39. Paragraphs 10 through 29 are incorporated by reference.

40. Travelers, as an insurer, is subject to the laws of the State of Texas and owed the Firm the duty to deal with it fairly and in good faith.

41. Travelers refused to pay the Firm's Claim despite the fact that its liability was clear. No reasonable insurer would have failed to pay this claim with the information available to Travelers at the time that it decided not to pay the full value of the Claim. The conduct of Travelers constitutes a breach of the common law duty of good faith and fair dealing owed to insureds under insurance contracts. Likewise, Travelers' failure to adequately and reasonably investigate and evaluate the Claim, while Travelers knew or should have known by the exercise of reasonable diligence that its liability is reasonably clear, constitutes a breach of the duty of good faith and fair dealing.

42. The refusal to fully adjust and pay the Claim in violation of the duties of good faith and fair dealing, proximately caused the Firm to suffer independent damages including economic damage caused by the denial. Travelers is liable to the Firm for extra contractual damages for its separate injury and independent damages in a sum in excess of the minimum jurisdictional limits of the court.

**D. VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES ACT BY TRAVELERS.**

43. Paragraphs 10 through 29 are incorporated by reference.

44. The Firm purchased the Policy and is a consumer as that term is defined under the Texas Deceptive Trade Practices Act. The Firm has been damaged by Travelers', described above, which constitutes a deceptive or unfair insurance practice as that term is defined under the Texas Insurance Code.

45. Each of the acts described above, together and singularly, constitute a violation of the Texas Deceptive Trade Practices Act pursuant to its tie-in provision for Insurance Code Violations. Accordingly, Travelers also brings each and every cause of action alleged above under the Texas Deceptive Trade Practices Act pursuant to its tie-in provision.

46. Travelers has violated the Texas Deceptive Trade Practices Act in the following non-exclusive manners:

   a. representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

   b. representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

   c. failing to disclose information concerning good or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the customer into a transaction into which the customer would not have entered had the information been disclosed;

   d. knowingly misrepresenting to a claimant pertinent facts or policy provisions relating to coverage at issue; and

   e. not attempting in good faith to affect a prompt, fair, and equitable settlement of a claim submitted in which liability has become reasonably clear.

47. The conduct of Travelers, as described herein, was a producing cause of the Firm's economic damages. As a result, the Firm suffered economic damage and expenses for which Travelers is liable.

48. As a direct result of Travelers' knowing misconduct, the Firm suffered additional damages. Accordingly, Travelers is liable to the Firm for economic damages and additional damages of up to three times economic as permitted by the Texas Deceptive Trade Practices Consumer Protection Act.

E. **BREACH OF CONTRACT BY IBERIA.**

49. Paragraphs 10 through 29 are incorporated by reference.

50. The Firm entered into a contract with Iberia for the deposit, handling, and transfer of trust funds. Pursuant to this contract, Iberia was to provide accurate information regarding the status of deposits made by the Firm. At all times, Iberia was contractually obligated in a commercially reasonable manner with respect to the Firm.

51. The instrument in question (*i.e.* the cashier's check) constitutes a negotiable instrument under the Uniform Commercial Code[1]. A party to a contract that would be governed under the Uniform Commercial Code cannot disclaim or contract out of its duty of good faith and obligation to exercise ordinary care.

52. Iberia failed to exercise commercially reasonable standards by informing the Firm that funds relating to the Cashier's Check were available, and failing to disclose the material fact that the funds in question were available only as a credit.

53. Iberia failed to exercise commercially reasonable standards when it represented the funds in question were available when it knew or reasonably should have known that the instrument had not yet cleared and these funds were only available on credit.

54. Iberia failed to exercise commercially reasonable standards when it represented to the Firm that the funds were available prior to contacting Citi-Bank, the bank clearly specified on the instrument as the payor bank.

55. It was foreseeable that the Firm would rely on such representation that the funds were available when Iberia made the aforementioned representation. Moreover, it is foreseeable

---

[1] Under the Uniform Commercial Code, Chapter 3, Section 3.104(f), "Check" means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order."

that any subsequent transactions made would occur as a direct result and in reliance on this representation.

56.     As a direct result of Iberia's failure to exercise commercially reasonable standards, Iberia breached its contract with the Firm, and caused the Firm actual and consequential damages. Accordingly, Iberia is liable to the Firm for actual and consequential damages resulting from Iberia's failure to exercise ordinary care in the course of its ordinary business in which it is engaged.

**F.    NEGLIGENT MISREPRESENTATION BY IBERIA.**

57.     Paragraphs 10 through 29 are incorporated by reference.

58.     Iberia, in the course of its business and while involved in a transaction in which Iberia had an interest, provided false information to the Firm.

59.     Iberia failed to exercise reasonable care and/or competence in communicating to the Firm through its online records that the funds represented by the Cashier's Check were in the Firm's trust account and available for use rather than communicating that these funds existed only as a credit.

60.     Iberia failed to exercise reasonable care and/or competence in communicating to the Firm through its online records that the Cashier's Check in question had not in fact yet cleared and that the funds represented by the Cashier's Check were being made available by Iberia to the Firm as a credit.

61.     The Firm justifiably relied on the false information provided by Iberia in its representation that the funds in question in fact were available in the Firm's trust account when in actuality these funds were provided by Iberia only as a credit.

62. The Firm justifiably relied on Iberia's representation that the funds represented by the Cashier's Check were available in the Firm's trust account when it authorized further transactions.

63. The Firm justifiably relied on the false information provided by Iberia in its representation that the funds represented by the Cashier's Check had in fact cleared and were available in the Firm's trust account

64. Iberia failed to exercise ordinary care in the following non-exclusive matters:

   a. representing to its customer that funds from the Cashier's check were available, when in fact the amount in question was credited by bank as a "courtesy" to customer.
   b. failing to disclose the material fact that the instrument had not yet in fact cleared and that the funds were available only as credit.
   c. failing to contact the Bank specified on the instrument as the payor bank, Citi-Bank, prior to releasing any credits and/or funds to the Firm.
   d. failing to contact the Bank specified on the instrument as the payor bank, Citi-Bank, prior to crediting Firm's account.
   e. representing to the Firm that the funds were available when in fact these funds were provided by Iberia on credit.

65. As a direct result of Iberia's negligent misrepresentations, the Firm sustained actual and consequential damages. Accordingly, Iberia is liable to the Firm for actual and consequential damages resulting from Iberia's failure to exercise ordinary care in the course of its ordinary business in which it is engaged.
.

## VII.
## CONDITIONS PRECEDENT

66. All conditions precedent to this lawsuit have occurred or have been waived.

WHEREFORE, PREMISES CONSIDERED, the Firm prays that Defendants be cited to appear and answer, and that on a final trial on the merits, the Firm recover from Travelers and

Iberia actual damages, consequential damages, statutory damages under the DTPA and the Texas Insurance Code, interest at the highest rate provided by law, attorney's fees, court costs, and any other relief in law or in equity in which the Firm may be entitled.

Respectfully submitted,

By: */s/ Mark D. Johnson*_____
Mark D. Johnson
State Bar No. 10770175
3550 Parkwood Blvd., Suite A201
Frisco, Texas 75034
972-383-9377-Telephone
337-235-1095-FacSimile
Mark@flanniganlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to Defendant's Counsel.

*/s/ Mark D. Johnson*
Mark D. Johnson